GALVESTON, HOUSTON & HENDERSON RAILROAD COMPANY v. PENNE-
FATHER & CO.

Decided March 16, 1910.

1.—Railways—Connecting Lines—Partnership—Contract—Joint Operation.

A contract between connecting lines of railway for the transportation of the traffic and operation of the trains of one over the line of the other considered and held, neither to constitute a partnership, nor such joint operation as would render the connecting line liable for a loss of cotton shipped on contract with and from a station on the line of the other, in the absence of proof that it reached or was carried over such connecting line.

**2.—Same.**

A contract between connecting railways held to be, in effect, a trackage arrangement for the operation of the trains of one over the track of the other for a compensation based on the cost of maintenance and service and proportionment to the total "wheel miles" of the respective companies over the track, which would not render the owning company liable upon contracts of the other for through transportation of freight originating on the other's lines carried upon its contract and transported by it over the connecting track in its own trains. But if such contract made the two roads partners or joint carriers of goods, it was only as to property reaching and carried over the track in question; and where the shipment was not shown to be billed or routed over such connection or to have actually reached or been carried over it, or the loss to have occurred thereon, such connecting road was not liable.

**3.—Action Against Receiver.**

An action against a receiver of a railway upon a cause of action not growing out of his acts, but originating in transactions of the company prior to his appointment, can only be brought by leave of the court in which the receivership is pending.

Appeal from the District Court of McLennan County. Tried below before Hon. Marshall Surratt.

*Baker, Botts, Parker & Garwood* and *O. L. Stribbling,* for appellant.—The agreement of 1895 between the International Company and the Galveston Company as acted upon by the parties thereto in the operation of their respective trains over appellant's track from Houston to Galveston, conferred upon the International Company a license to use the tracks of the Galveston Company between Houston and Galveston for the purpose of hauling its own passengers, freight and cars between those points, and to points on its own line, and nothing more. Texas & N. O. R. Co. v. Berry, 31 Texas Civ. App., 3; International & G. N. R. Co. v. Foltz, 3 Texas Civ. App., 644; Gulf, C. & S. F. Ry. Co. v. Baird, 75 Texas, 256; Houston & T. C. Ry. Co. v. Williams, 31 S. W., 556; Houston & T. C. Ry. Co. v. Groves, 48 Texas Civ. App., 45; Gulf, C. & S. F. Ry. Co. v. Edloff, 89 Texas, 454; Texas Central Ry. Co. v. Pool, 52 Texas Civ. App., 307; Chicago, R. I. & T. Ry. Co. v. Halsell, 35 Texas Civ. App., 126; Houston & T. C. Ry. Co. v. McFadden, 91 Texas, 203; Gulf, C. & S. F. Ry. Co. v. Miller, 98 Texas, 270; Jolly v. Missouri, K. & T. R. Co., 38 Texas Civ. App., 332; St. Louis, A. & T. Ry. Co. v. Neel, 19 S. W., 964; Moorshead v. United Rys. Co., 96 S. W., 266; 100 S. W., 612; State v. Trinity & B. V. Ry. Co., 56 Texas Civ. App., 424; Union Pac. Ry. Co. v. Chicago, R. I. & P. Ry. Co., 163 U. S., 564; Thompson on Negligence, secs. 1955, 3383; 30 Cyc., 349; 31 Cyc., 1189-1195-1197.

*Jno. W. Davis,* for appellees.—Receivers in this State can be sued without leave of court. Rev. Stats., art. 1483. The Act of Congress does not limit the right to sue a receiver without leave of court to cases where the cause of action arose from the conduct of the receiver himself or his agents; with respect to the question of liability, the receiver stands in place of the corporation itself. McNulta v. Lochridge, 141 U. S., 329-331. Receivers are proper parties to suits

against a railroad for which he is receiver. Howe v. Harding, 76 Texas, 17; San Antonio & A. P. Ry. Co. v. Ruby, 80 Texas, 172; Frankle v. Jackson, 30 Fed., 398; Dallas Cons'd Trac. Co. v. Hurley, 10 Texas Civ. App., 246; International & G. N. R. Co. v. Ormond, 57 Texas Civ. App., 79.

The International & G. N. and the Galveston, H. & H. Railway Companies by their contract of 1895, became one system of railways from interior points in Texas to the Gulf, and were so held out to the public, and whenever a contract was entered into in the interior for transportation of freight to the ship side or beyond, it was the contract of both railroads to the extent that when loss occurred on either road both were liable to the owner. 6 Am. & Eng. Ency., 655; Illinois Cent. Ry. Co. v. Jones, 39 So., 493; Alabama & V. Ry. Co. v. Lamkin, 30 So., 47; Swift v. Pacific Mail Steamship Co., 106 N. Y., 206; Rocky Mt. Mills v. Wilmington & W. R. Co., 25 S. E., 854; International & G. N. R. Co. v. Anderson, 3 Texas Civ. App., 8; Missouri, K. & T. Ry. Co. v. Wells, 24 Texas Civ. App., 304; Galveston, H. & S. A. Ry. Co. v. Johnson, 37 S. W., 243.

Under the contract of 1895 the two carrier defendants in this suit conferred on each an agency for the other in the transportation of traffic to and from interior points in Texas, and by so doing made themselves bound to any shipper for any loss that may have occurred on either railroad. Gulf, C. & S. F. Ry. Co. v. Baird, 75 Texas, 256; Ft. Worth & D. C. Ry. Co. v. Williams, 77 Texas, 125.

The burden rested on the G. H. & H. Railway to show that none of the lost cotton was lost on its road, and if it be held that the evidence does not show where the cotton was lost, both defendants are liable therefor, even if the G. H. & H. Railway should be held to be only connecting carrier. Same authorities under preceding propositions, also International & G. N. R. Co. v. Foltz, 3 Texas Civ. App., 644.

RICE, ASSOCIATE JUSTICE.—Appellees, a copartnership of Liverpool, England, instituted this suit against the International & Great Northern Railroad Company, and T. J. Freeman, the receiver of said company, and the Galveston, Houston & Henderson Railroad Company, to recover the value of 34 bales of cotton, being parts of two shipments, alleged to have been delivered by plaintiffs, through their agents, to the International & Great Northern Railroad Company at Italy, Texas, to be shipped by it through the port of Galveston, Texas, to them at Liverpool, and for which two shipments of cotton said first named company executed its two foreign bills of lading to plaintiffs' agent, Edward L. Cox, one of which was for 100 bales and the other for 200 bales; that all of said cotton except 34 bales was delivered to plaintiffs in Liverpool, which 34 bales it was alleged was converted between April and August, 1907, by said two railroad companies at Galveston, Texas. It was further alleged that said two companies were partners in said shipment, agents for each other, and were operating under a joint traffic arrangement; and it was likewise alleged that T. J. Freeman was appointed receiver of said I. & G. N. Railroad Company some time in January or February, 1908.

Appellant answered, first, by plea of privilege to be sued in Galveston, the county of its residence; also by general and special exceptions, and denied under oath the partnership, or that the two railroad companies were agents for each other with respect to said shipment; and further alleged that none of the cotton described in plaintiff's petition, alleged to have been converted, ever came into the possession of appellant or was in any way handled or controlled by it or any of its agents in its transportation from Italy, Texas, to Galveston, Texas, but that said cotton was, at all times, under the control and management of the International & Great Northern Railroad Company, and that appellant was in no way interested in said shipment or responsible therefor.

Thomas J. Freeman, receiver of the International & Great Northern Railroad Company, answered by special exception and a plea wherein it was alleged that he was appointed receiver of the property of said company by the Circuit Court of the United States for the Northern District of Texas subsequent to the accrual of the cause of action sued upon, and that plaintiffs had not procured from said court in said cause in which he was appointed receiver, any leave or permit to bring this suit against him as such receiver on the cause of action asserted. And further alleged that plaintiffs' cause of action, if any, did not grow out of any act or transaction of his in carrying on the business connected with the property of said company as its receiver.

Upon trial before the court without a jury appellant's plea of privilege was overruled and judgment was rendered in favor of plaintiffs for $3,038.28, against both railroad companies, and said suit as to the receiver, Thomas J. Freeman, was dismissed with his costs. Appellant alone prosecutes this appeal.

We pretermit any discussion of the questions raised in appellant's first assignment, wherein it urges that the court erred in overruling its plea of privilege to be sued in Galveston County because, in view of the disposition we make of the case, we regard it unnecessary to do so.

It is insisted by appellant in its second assignment that the court erred in holding that the contract between appellant and the I. & G. N. Railroad Co., executed on the 19th of November, 1895, as set out in the court's findings of fact, constituted a joint traffic arrangement or agreement between the parties thereto, and rendered appellant jointly liable to appellees for the value of the cotton sued for herein. The contract referred to is voluminous, and we will only insert the substance thereof, as found by the court, which is as follows:

### "ARTICLE I.

"The Galveston Company hereby agrees, during the period of this agreement, to receive at all reasonable times, and to draw and transport over its road between the cities of Houston and Galveston, without delay or discrimination, all passengers, merchandise, tonnage and cars, loaded or empty, of the said International Company, and which shall be tendered by the said International Company to the said Galveston Company, either at the city of Galveston or at the city of

Houston, or at any of the intermediate points between said cities on the line of road of the Galveston Company; and the said Galveston Company shall, upon demand of the said International Company, and when required by said International Company, transport and draw over its said railroad the cars, empty or loaded, of said International Company in separate trains. The said Galveston Company further agrees to receive and deliver such passengers, freight, merchandise, tonnage and cars of the said International Company at the stations, depots, sidetracks, yards and freight houses of the said Galveston Company, and keep and care for same on its main tracks or side tracks and in its yards and at its terminals in the cities of Galveston and Houston, and at intermediate stations between said cities, in the same way and to the same extent that it receives and delivers, keeps and cares for, or should receive and deliver, keep and care for its own cars and the passengers, freight, merchandise and tonnage moved in its own cars.

## "ARTICLE II.

"For and in consideration of the receiving, delivering, keeping, caring for and transporting of the passengers, merchandise, tonnage and cars of the International Company by the Galveston Company, as provided for in Article I hereof, the said International Company agrees to pay the said Galveston Company as follows:

"Section 1. As fixed compensation for the services to be rendered by the Galveston Company and for use of its road and appurtenant properties, as herein provided, the International Company shall pay the Galveston Company $62,000 per annum, $12,000 in equal monthly installments and the balance to be paid on the interest of the first mortgage bonds of the Galveston Company.

"Sec. 2. The International Company shall further pay the actual cost of the Galveston Company for train services in hauling and transporting the separate trains of the International Company under this agreement, including interest at the rate of six percent per annum on the cost of the Galveston Company's engines used in such transportation, also the cost of repairs on such engines made necessary by use in such service.

"Sec. 3. The International Company further agrees to pay to the Galveston Company what shall be known as 'Proportional charge for maintenance and operation of freight terminals at Galveston & Houston,' and the sums to be paid under this head by the International Company shall be ascertained and determined in the following manner (which is based on the tonnage handled):

"Sec. 4. The International Company further agrees to pay to the Galveston Company what shall be known as 'proportional charge for maintenance and operation of the Galveston Railroad,' including bridges, side and passing tracks and switches, including taxes, cost of insurance, renewals and repairs. It excepts the expense of operating trains of the Galveston Company not doing any business for the International Company—the amount to be paid determined on the wheelage basis."

Sec. 5. Provides that the Galveston Company shall maintain and

operate its railway and appurtenant properties covered by the agreement, including freight terminals and freight houses, fully equal to the standard of maintenance and operation of the first-class railways in the State of Texas.

### ARTICLE III.

Provides for a system of accounting in order to determine the amount due by the International Company to the Galveston Company under Article II.

### ARTICLE IV.

Provides for the termination of the agreement in the event of a failure of either company to perform the obligations assumed in the contract.

### ARTICLE V.

Provides that "The separate trains · of the International Company provided for herein may be drawn by its own engines and operated by its own train crews and at its own expense while on the Galveston Railroad, but they are, in entering upon and leaving, and while on said joint track, to be subject in their movements to the control and orders of the Galveston Company."

### ARTICLE VI.

Defines local traffic and reserves all such local traffic to the Galveston Company originating on the Galveston Railroad; provides that the Galveston Company may require the International Company to carry on its trains any part of the local traffic of the Galveston Company; also recites the execution of a similar agreement with the Missouri, Kansas & Texas Railway Company of Texas.

### ARTICLE VII.

Provides that in cases of injury, loss or damage arising in the use of the freight terminals of the Galveston Company at Houston and Galveston, under this agreement, the cost and expense thereof shall be paid by the Galveston Company and charged to the maintenance and operation of freight terminals at Galveston and Houston; also provides for payment of loss or damage growing out of the handling of freight, and providing that all losses, injuries and damages arising exclusively through the fault of the International Company while operating its own trains, shall be borne by the International Company; also a similar provision with reference to the Galveston Company.

### ARTICLE VIII.

The International Company reserves the right, at its own expense, to appoint its own agent and provide for sale of tickets and doing the billing relating to its own business; also joint agents, when used,

shall be paid by the Galveston Company, and charged to the operating account.

## ARTICLE IX.

Provides for arbitration.

## ARTICLE X.

Provides that nothing contained in the contract shall preclude the Galveston Company from hauling or transporting passengers, tonnage, etc., of other railroad companies upon such terms as may be lawfully agreed upon. The contract is for the term of forty years.

The above contract was submitted to and approved by the Railroad Commission of Texas.

The findings of fact by the court, supplemented by the evidence as set forth in the statement of facts, wholly failed to show that any of the cotton lost was ever shipped over the Galveston, Houston & Henderson Railroad; and it is not affirmatively shown that any of said shipment was carried over said road. The books of the I. & G. N. Railroad Co. at Galveston show that all the cotton, except the missing cotton, was received in Galveston by the I. & G. N. Railroad Company, and transferred to the steamship company. And, while it might be inferred from the evidence that that part of the cotton so received in Galveston reached there in the cars of the I. & G. N. Company by way of the Galveston, Houston & Henderson road, still, there is no positive evidence of that fact; nor does the contract require all shipments on the I. & G. N. to be carried over its line, and it is possible that this shipment may have reached Galveston on some other road. In fact, there is nothing in the record going to show what became of the thirty-four missing bales after their delivery to the I. & G. N. Railroad Company at Italy, Texas. The two bills of lading in this case were executed by the I. & G. N. Railroad Company, but no allusion was made in either to the Galveston, Houston & Henderson Railroad Company, nor was said shipment routed over the latter road. From aught that appears in the record, we have as much right to assume that the cotton was lost between Italy and Houston on the line of the I. & G. N., as we have to say that it was lost between Houston and Galveston, on the line of the Galveston, Houston & Henderson Railway.

We are not prepared to agree with counsel for appellees that the contract between the two railway companies, above set out, constitute them a partnership, nor render them jointly liable as the agents of each other so far as this control is concerned, but that the same was more in the nature of a trackage arrangement, by which the I. & G. N. obtained the right and privilege of running its cars into Galveston over the road of the Galveston, Houston & Henderson Company; and this view is emphasized by the testimony of General Manager Hill with reference to the manner of conducting business between said companies. He testified: "It is a fact that the I. & G. N. Company uses the G., H. & H. Railroad from Houston to Galveston, and has done

so for the last two or three years for the purpose of transporting all the freight and passengers carried by it from interior points in Texas, under the agreement referred to." But he further testified that the three lines mentioned do not do business together, but do use the same facilities under the agreement referred to; that the I. & G. N. and the M., K. & T. run their own engines and cars over the the G., H. & H. Railroad Company's tracks, and the amount paid by each is the percentage of the total cost of maintaining said road as its total wheel miles monthly bears to the total wheel miles. (See in this connection: Houston & T. C. R. R. Co. v. McFaddin, 91 Texas, 194; St. Louis A. & T. Co. v. Neell, 19 S. W., 963; Union Pac. R. R. Co. v. Chicago, R. I. & Pac. Ry. Co., 163 U. S., 564; Alford v. Chicago, R. I. & P. Railway, 3 Interstate Commerce R., 519; State v. Trinity & B. V. Ry., 56 Texas Civ. App., 424, 120 S. W., 1172, and authorities there cited.) But if it were conceded that the contract made them partners, then it is evident that it could not possibly constitute a partnership, except as between them for the transportation of traffic over the Galveston, Houston & Henderson Railway, and to render them responsible, as partners, for the loss of any freight, certainly the loss must be shown to have occurred, even under the contract, on the line of the Galveston, Houston & Henderson Railroad, or after the shipment had gone into its possession or control; for, if the cotton was lost before its arrival at Houston, certainly the latter line could not be held responsible for it, for the very reason that the supposed partnership as above set forth could not possibly be held to embrace or cover traffic which had not come into its control or been transported over its line. There is no evidence in the record showing or tending to show how this cotton was loaded for shipment at Italy, whether in one or more cars, or whether the entire 300 bales was in fact loaded on the cars; and so far as anything appears in the record, the missing cotton may never have started over the line of the I. & G. N., and may have been lost at Italy; in which event it certainly could not be contended that the Galveston, Houston & Henderson Railroad Company could be held responsible for it, even if the contract between the companies constituted them partners in the transportation of traffic over the latter line. It is true that the bills of lading issued by the I. & G. N. covered the entire 300 bales, but there is no presumption from the issuance thereof that the cotton had in fact been loaded at the time they were issued. So that if we were to hold that the contract between the two railway companies constituted them partners, as contended by appellee, still we think they would be partners only as to traffic handled by virtue of said contract over the line of the Galveston, Houston & Henderson Railroad Company; and unless the proof in this case had shown (which it wholly fails to do) that the missing cotton was ever received or hauled over the line of the latter company, it could not be held responsible for its loss by reason of said contract.

Hence we think that the court erred in rendering judgment against the latter company for the value of the cotton so lost. We therefore sustain this assignment.

Appellees insist, by a cross-assignment duly presented, that the court erred in sustaining the plea in abatement of Thomas J. Free-

man, receiver of the International & Great Northern Railroad Company, and dismissing said Freeman from the case with costs. It was shown that the cotton was received for shipment by the I. & G. N. Company during the month of October, 1906, and it is alleged that it was converted by both of said companies during the year 1907. It appears from the allegations of the pleading, as well as the evidence, that Freeman was appointed receiver of said company in February, 1908, and it is not alleged nor shown that the plaintiffs obtained leave from the Federal Court in which the receivership was pending to prosecute this suit against said receiver. This being true, we think the judgment of the court below dismissing said receiver with his costs was correct. The rule seems to be well settled that at common law a receiver could not be sued without the permission of the court appointing him. (See Alderson on Receivers, p. 711, sec. 519.) But this rule has been changed by statute in some of the States, as well as by an Act of Congress. The third section of the Acts of Congress of March 3, 1887, and August 13, 1888, reads as follows: "That every receiver or manager of any property appointed by any court of the United States, may be sued in respect of any act or transaction of his in carrying on the business connected with such property, without the previous leave of the court in which said receiver or manager was appointed; but such suit shall be subject to the general equity jurisdiction of the court in which such receiver or manager was appointed so far as the same shall be necessary to the ends of justice."

We hold that in order to prosecute a suit against a receiver appointed by a Federal Court without leave of the court, the suit must be predicated upon some action of the receiver or his predecessor in carrying on the business connected with such property; so that it is clear that if the cause of action accrued prior to the appointment of the receiver, then leave of the court must be obtained to prosecute the suit before the action could be maintained; and failure to obtain such leave justifies the court in dismissing the receiver from such proceedings. In Alderson on Receivers, p. 731, it is said, after discussing this statute and the decisions under it, that "The congressional statute under consideration may be said to support the following propositions: A suit may be instituted against a receiver appointed by a Federal Court, and prosecuted to final judgment without the consent of the court, the subject matter of which arose out of some act or transaction of the receiver, his predecessor or the employes and agents of either of them, in the actual operation of the property in his possession and continuation of the business for which such property was used. Second. A suit against a receiver of a Federal Court which has not for its object the vindication of a wrong or the enforcement of a right arising from some act or transaction of the receiver or his predecessor, or the employes and agents of one of them, in the actual operation of the property in his possession and continuation of the business for which such property was used, without the consent of the court, can not be maintained, and according to the rule of the federal judiciary, a judgment rendered in such suit will be void, because of want of jurisdiction."

See also Smith v. St. Louis & S. F. Ry. Co., 52 S. W., 378, in which

it is said by the court: "This proceeding against the receivers appointed by the Circuit Court of the United States for the Eastern District of Missouri, is without any permission or authority from that court, and hence can not be maintained. The cause of action did not arise or accrue while the receivers were in charge of and conducting the business, and therefore the plaintiff does not come within the provisions of the Act of March 3, 1887 (24 Stat., p. 554). The accident complained of occurred on the 20th of October, 1893, and the receivers were not appointed until December 23, 1893. Receivers are officers of court to hold and manage property which is in the registry of the court, and persons having any claim to property so situated must submit their claims to the court that has obtained jurisdiction over the *res,* and the court will not permit its officers to be sued in any other tribunal without its consent. This is not only a law of comity among courts, but it is a jurisdictional necessity, for it is manifest that two courts could not, acting separately, successfully manage the property or harmoniously distribute it." Citing Beach on Receivers (Alderson's ed.), secs. 229-240; Kerr on Receivers (2d ed.), pp. 196 et seq. "The petition does not aver that the consent or permission of the United States Circuit Court to sue its receiver was asked or obtained before this action was begun, and there is a total lack of evidence of any such steps having been taken. The action can not, therefore, be maintained, and the judgment against the receivers, or as amended, that the judgment against the company be certified to the receivers, is reversed." (See also 34 Cyc., pp. 411, 416b and 417.)

The case seems to have been fully developed in the court below. We therefore conclude that the judgment, so far as the same affects the Galveston, Houston & Henderson Railroad, should be reversed and here rendered in its favor; but that the judgment against the International & Great Northern Railroad Company, as well as the judgment in favor of T. J. Freeman, receiver, be and the same is in all things affirmed, and it is so ordered.

*Affirmed in part and reversed and rendered in part.*

Writ of error refused.